```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

| | |
|---|---|
| **TEXACO EXPLORATION AND PRODUCTION INC. AND MARATHON OIL COMPANY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 99-3623 c/w 99-3646 and 00-0813** |
| **AMCLYDE ENGINEERED PRODUCTS, ET AL.** | **SECTION "B" (5)** |

**ORDER AND REASONS**

Before the Court is the Defendant AmClyde Engineered Products, Inc. and AmClyde Engineered Products Company, Inc. ("AmClyde") motion for Summary Judgment (Rec. Doc. No. 1464). After review of the pleadings and applicable law, and for the reasons that follow,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

*BACKGROUND*

**I. Facts Leading to Texaco Action**

Texaco Exploration and Production, Inc. and Marathon Oil Company (hereinafter "Texaco") are the lessees of an offshore federal lease at Viosca Knoll Black 786 on the Outer Continental Shelf. This is the site of the oil and gas development project, Petronius. This project was a $400 million deepwater drilling and production project for the development of 80 to 100 million barrels of oil equivalent. During the 1998 construction of the Petronius compliant tower, a main line on a crane , which was mounted on the Derrick Barge 50 (DB-50) failed. The crane or load line failure caused the deck section that was suspended (the

1

"South Deck Module") to fall into the Gulf of Mexico on the Outer Continental Shelf of the Gulf Coast of Alabama and Louisiana.

Prior to the initiation of construction, On March 16, 1996, Texaco entered into the Viosca Knoll Block 786 Contract for Engineering, Fabrication, and Installation, bearing Contract No. NOS-08-96 with J. Ray McDermott, Inc. ("McDermott"), the Contractor, which provided the contractual terms and conditions for engineering, fabrication, and installation of the Petronius Compliant Tower, an offshore drilling and production tower in the Gulf of Mexico offshore the State of Alabama.  This included the tower platform and its components, as well as attendant drilling rigs at Viosca Knoll Block 786.  The DB-50 barge used in the project was owned by J. Ray McDermott International Vessels, Ltd. ("JRMIV").  The crane mounted to the DB-50 was manufactured and designed by the predecessor to United Dominion Industries.  When AmClyde Engineering Products, Inc. was formed in 1989, it inspected the crane on numerous occasions at the request of the crane's owner.  Its inspections failed to reveal design and condition flaws, resulting in an alleged negligent inspection and its attempted repair was also blamed as faulty.  AmClyde later became a subsidiary of Friede Goldman Halter, Inc.

On December 3, 1998, McDermott began installation of both modules onto the already constructed support frame of the Petronius compliant tower.  After the installation of the North Deck, McDermott began installation of the South Deck Module. Between the initial lift of the South Deck Module from the

2

material barge and its placement on the support frame, the crane's wire rope load line failed, dropping the South Deck Module to the sea floor.

## II. Facts Leading to Underwriters' Subrogation Action

Builder's Risk Underwriters ("the Underwriters") insured the Petronius compliant tower construction project, including the lost South Deck Module. The Builder's Risk Policy comprises a general conditions section for physical damage coverage and a third party legal and contractual liabilities section. Texaco was a principal, named assured under the policy. Under the terms of the policy, Underwriters paid Texaco more than $72 million for covered losses for the loss of the South Deck Module, but not delayed production.

## III. Procedural Posture and Related Facts

On December 2, 1999, Texaco sued among others AmClyde and Friede Goldman Halter, Inc., successors to the designer and manufacturer of the Clyde Whirley 4000 Model 80 crane used. Federal question jurisdiction stems from the Outer Continental Shelf Lands Act (OCSLA Act). Texaco did not sue McDermott because their contract contained a binding arbitration clause, but was added to the suit pursuant to Fed. R. C. Pro. 14(c). The defendants in Texaco's suit tendered McDermott as a third-party defendant under the rule and the District Court granted McDermott summary judgment. The Fifth Circuit panel reversed this summary judgment ruling, and granted Texaco's motion to stay litigation

3

between Texaco and McDermott.  Texaco and McDermott subsequently submitted to arbitration and resolved their dispute.

On the Underwriters' subrogation claim, the district court granted summary judgment to AmClyde on the ground that it was an additional insured under the Builder's Risk Policy, entitled to waiver of subrogation .  The court granted AmClyde defense costs under the same policy.

This Court held an admiralty bench trial on this action from October 15, 2001 through December 6, 2001.  The Court found that Plaintiffs Texaco Exploration and Certain Underwriters at Lloyd's and London Market Insurance Companies subscribing to Policy Nos. S611625 and S611626 ("Underwriters"), failed to sustain their burden of proof with respect to liability against all defendants, except McDermott.  The Court concluded that JRMIV was liable to Texaco and Underwriters for unseaworthiness of the DB-50 because of the crane load line's failure, and in the alternative, that McDermott's negligence in caring for and inspecting the wire rope, its knowledge of the equalizer system movement and failure to post a lookout to monitor said movement as done in the earlier successful lift and placement of the North Deck Module, *inter alia*, were superseding causes.  JRMIV moved to dismiss Underwriters' subrogation action based on the policy language and the Court vacated its liability findings and entered summary judgment for JRMIV on the ground that JRMIV was An additional insured entitled to a waiver of subrogation or in the alternative that McDermott as the bareboat charter was

4

responsible for the condition, maintenance and operation of the DB-50 at all pertinent times, precluding liability against JRMIV for unseaworthiness. As previously mentioned, the Court rendered judgment in favor of third party plaintiffs AmClyde and against Third Party Defendants, Certain Underwriters at Lloyd's and London Market Insurance Companies subscribing to Policy Nos S611625 and S611626, for Two Million Five Hundred Thirty-Four Thousand and No/100 Dollars, together with post-judgment judicial interest.

On appeal, the Fifth Circuit asserted that while OSCLA was correctly asserted, the Admiralty jurisdiction was not properly invoked. Therefore, the case was remanded for a jury trial and the proper application of law of the adjacent state such that the law of the adjacent state may be applied regarding liability on the Texaco claims. In addition, upon remand this Court should permit the inclusion of Texaco's expert testimony.

On the Underwriter's Appeal, the District Court ruling that AmClyde is an "other assured" under the Builder's Risk Policy entitled to a waiver of subrogation and costs was affirmed. The Fifth Circuit agreed with the District Court decision not to require allocation, finding that the two entities not insured were predecessors in interest to AmClyde that were represented by AmClyde's counsel, and that the entities appeared in all respects, in the same posture as AmClyde facing the same liability and requiring the same defense as did AmClyde. The Fifth Circuit also affirmed its ruling that JRMIV is an "other

assured" entitled to waiver of subrogation.

One month later, the 5th Circuit granted Underwriter's request for remand of its subrogation claims against United Dominion, and stated that nothing precluded Underwriters from requesting proper allocation of United Dominion's uninsured defense costs in connection with these claims.

The jury trial is now scheduled on April 7, 2008. Plaintiffs Texaco Exploration and Production, Inc. And Marathon Oil Company (collectively "Texaco") pursue liability claims against AmClyde, Friede Goldman Halter, Inc, and United Dominion Industries.  Both AmClyde and FGH are debtors in a Chapter 11 bankruptcy action presently pending in the United States Bankruptcy Court in the Southern District of Mississippi.  Texaco claims that FGH is liable for the acts and omissions of AmClyde. Texaco has waged claims against United Dominion Industries for product liability arising out of a defective design, manufacturing, marketing and sale of the crane, as well as for failure to warn.  Texaco also alleges negligence in relation to the aforementioned claims.  Texaco alleges that AmClyde should be held liable for negligent market inspection, maintenance and repair of the crane.  Plaintiff alleges that United Dominion's and AmClyde's acts and omissions constitute wanton conduct, and thus seek all damages in the form of delayed production of minerals, uninusured and reinstallation costs, and other uninsured losses, together with pre-judgment interest and costs for applicable state law compensatory and punitive damages.  On

Tuesday, March 11, 2008 this court took under advisement AmClyde's motion for summary judgment after oral argument was heard in open court.

Builders Risk Underwriters still pursues its subrogation claims against United Dominion Industries who were declared by the District Court as not constituting an "other insured." The Fifth Circuit acknowledged that Underwriters could seek allocation of uninsured litigation costs relating to UDI. Plaintiffs ask for judgment against United Dominion for actual damages of approximately $90,000,000.00 to be demonstrated at trial; pre-judgment and post-judgment interest; Costs; Attorneys' Fees; and All other relief in law and in equity, both general and special to which Plaintiffs may show themselves entitled.

AmClyde moves for summary judgment on the grounds that Plaintiff Texaco has stipulated that the only damages it seeks in this matter against AmClyde are damages for delayed production and these damages have been specifically waived by Texaco against AmClyde because of AmClyde's subcontractor status. AmClyde argues that the Fifth Circuit's affirmation of the trial court finding that AmClyde was a subcontractor regarding the Underwriter claim is the law of the case. The subcontractor status issue has already been decided by the Fifth Circuit so this court is precluded from revisiting it. As such, AmClyde argues that as a subcontractor, Texas has made no claim against AmClyde that it has not already contractually waived through Section 29 of the contract.

Texaco argues that AmClyde's argument in favor of the application of the "law of the case" doctrine must fail because the Fifth Circuit did not opine as to whether AmClyde was a subcontractor for purposes of the Viosca Knoll Block 786 Contract for Engineering, Fabrication and Installation ("Petronius contract") and expressly based its holding that AmClyde was a subcontractor under the insurance contract. Texaco also avers that AmClyde does not qualify as a subcontractor under the Petronius Contract because of the Section 14 provision contained therein that requires the approval of Texaco for the utilization of subcontractors.

### DISCUSSION
**A.   Summary Judgment Standard**

Summary judgment is proper if the pleadings, depositions, interrogatory answers and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2554–55 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the

non-moving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Associates of North Texas*, 139 F.3d 532, 536 (5th Cir. 1998). The nonmovant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Id.* Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc*. 7 F.3d 1203, 1207 (5th Cir. 1993).

**B.  The Fifth Circuit Ruling**

Upon appeal, The Fifth Circuit affirmed the district court ruling that AmClyde is an "other assured" under the insurance policy. *Texaco Exploration and Production, Inc. v. AmClyde*, 448 F.2d 760, 779 (5th Cir. 2006). The Fifth Circuit based its ruling upon its finding that AmClyde was a subcontractor to the Petronius tower construction project. Specifically, the Fifth Circuit found:

> In light of the contractual agreement between AmClyde and McDermitt, in combination with AmClyde's provisions of work to the Petronius project itself subject to that contract, including the very lift of the deck module most closely tied to the property loss at the heart of this case, AmClyde is a subcontractor of the Petronius tower construction project. *Id*.

Despite the Fifth Circuit reference to AmClyde as a subcontractor of the Petronius Tower construction project, the status of AmClyde under the Petronius Contract was not raised by the litigants on appeal. Therefore, the status of AmClyde under the Petronius Contract was not before the Fifth Circuit, and must

9

be addressed by the district court. *See United States v. Bigler*, 817 F.2d 1138, 1140 (5th Cir. 1987); *see also Gentry v. Lowndes County, Miss.*, 337 F.3d 481, 485 (5th Cir. 2003).

**C.   Alabama Contract Law: Subcontractors[1]**

Alabama law defines a "subcontractor" as "one who takes a portion of a contract from the principal contractor or another subcontractor." *Avondale Indus., Inc v. Intl Marine Carriers, Inc.*, 15 F.3d 489, 494 (5th Cir. 1994); *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So.2d. 18 (Ala. 2002). *H.R.H. Metals* further elaborates on this meaning interpreting the meaning of subcontractor as, "one who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance. One who takes from the principal or prime contractor a specific part of the work undertaken by the principal contractor." *Id.* at 23. Using this standard, this Court must evaluate if AmClyde should be deemed a subcontractor.

AmClyde and McDermott entered into a written agreement requiring AmClyde's provision of work to McDermott in furtherance of the Petronius construction project. Subject to its contract with McDermott, AmClyde designed the deep water lowering system for use of the underwater installation of the tower support structure for the Petronius project and provided technical advice

---

[1] On remand, all parties agreed and this Court found that Alabama law would apply to all substantive legal issues (Rec. Doc. No. 1402).

10

to McDermott related to the crane's extended travel service and underwater use during the Petronius project, as well as on the main hook loading for the lifts of the North and South Deck Modules. The myriad functions performed outside of just inspection justify a categorization of AmClyde as a "subcontractor" under Alabama law. The written agreement to perform work under the contract with McDermott also supports this finding.

Neither Alabama law nor the Petronius Contract itself supports Texaco's assertion that AmClyde cannot establish that it was a subcontractor under the Petronious contract because it never performed work directly on that project. The terms of the Petronius Contract lists notable requisite tasks to the completion of the Petronius Tower construction project. Under Part 1–General – 1.1, the General Description of Work to Be Performed by Contractor is as follows:

> Contractor hereby covenants and agrees to perform the following services under the terms of this Agreement:
>
> > Furnish and pay for all labor, office and fabrication facilities, equipment, materials and supplies and to perform and complete all work and services required or necessary, in accordance with this Agreement for the engineering, design, drafting, fabrication, and installation of piles, template base, and top section for a compliant tower, together with the installation of topsides and Ensco, (formerly Dual) 29 or comparable drilling rig at Viosca Knoll Block 786, all as set forth more fully in Exhibit A – Scope of Work.

The design of the deep water lowering system for use of the

underwater installation of the tower support structure for the Petronius construction project undoubtably falls under the contractual umbrella of labor and materials required to complete all work and required or necessary services for the completion of the project, such as for the base and compliant tower construction. The advice provided regarding the main hook loading for the lifts of the North and South Deck also stands out as necessary service in furtherance of completion of the project. These tasks constitute specific parts of the work undertaken by McDermott to complete the Petronius Tower construction project, and therefore secure AmClyde's status as a subcontractor.

**D.  Contract Section 29 Preclusion of Any Claim by Texaco Against Subcontractors for Consequential Damages**

Alabama Contract law requires the Court to construe the Petronius contract so as to give meaning to all provisions. *See Board of Water & Sewer Comm'rs of Mobile v. Bill Harbert Constr. Co.,* 870 So.2d 688, 710 (Ala. 2003). AmClyde argues that Texaco waives any claim it may have for consequential damages against it because of Section 29 of the Petronius Contract, which states:

> To the extent not covered by Builder's Risk and Difference in Conditions insurance and notwithstanding any other provisions of this Agreement, Texaco and Contractor waive and release any claim against the other for consequential damages, however, and whenever arising under this Agreement or as a result of or in connection with the work and whether based on negligence, unseaworthiness, breach of warranty, breach of contract, strict liability or otherwise.

AmClyde asserts its status as subcontractor to which Section 29

applies. Texaco has stipulated that the only damages it seeks in this matter against AmClyde are damages for delayed production, which are waived by Section 29.  If applicable to AmClyde, Section 29 would absolve AmClyde of any liability for damages sought by Texaco.

Section 4 of the Petronius Contract, entitled, "Definitions" defines "Contractor" as the Contractor, its parent, subsidiaries, and affiliates, and the agents, employees and subcontractors of any of them.  However, Section 14 of the Petronius Contract entitled, "Subcontractors" requires Texaco's prior written approval of any subcontract or subcontractor for any work to be performed in the contract.  This clause potentially introduces ambiguity into the contract, as the work performed by AmClyde may constitute unauthorized subcontractor work.

In *Vesta Fire Ins. Corp v. Liberty National Life Ins. Corp.*, the Court ruled that the determination of two provisions of the Agreement as being inconsistent rendered the Agreement ambiguous. *893 So.2d 395*, 403 (Ala. Civ. App. 2003). This necessitated the use of the "former over the latter" rule, which dictates that, "if there exists inconsistency between two clauses of a contract, which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed."  Id.; see also *Extermitech v. Glassoc*, 951 So.2d 689, 694 (Ala. 2006). According to Texaco, the application of such a rule would render Section 29 inapplicable to AmClyde.  However, a key phrase

embodied in Section 14 refutes Texaco's claim. In part, Section 14 states, "[n]o subcontract shall be made without the prior written approval of Texaco of both the subcontract and the subcontractor (such approval shall not be unreasonably withheld), **but no such approval shall affect the provisions of this agreement**." (emphasis added).  The declaration contained within Section 14 stating that the prior written approval provision shall have no effect on the provisions of the agreement may serve as "an intention to thereafter qualify" the apparent inconsistency between Sections 14 and 29 in accordance with the former over the latter rule.  As such, Section 29 would still prove applicable to AmClyde as a subcontractor under the definition of Section 4 and under Alabama law, despite obtaining no prior written approval from Texaco to perform work.

   This Court finds that the application of the "former over the latter" rule to be unnecessary.  Section 14 contains within it clear instruction as to how this section should impact other provisions in the Petronius contract, thereby clearing up any potential ambiguity or inconsistency.  In giving meaning to all provisions of this contract as required by Alabama law, the unapproved subcontractor work does not nullify AmClyde's subcontractor status in accordance with Section 4.  Section 14 provides assurance that Texaco would not unreasonably withhold approval of subcontractors and Texaco has not provided any evidence in the record to support an ex-post facto claim that such approval would have been withheld if sought.  Moreover, in

considering the full text of Section 14, any potential ambiguity and inconsistency is resolved by a key phrase of the provision that states Texaco's approval would not affect the provisions of this agreement, leaving the reach of this provision to be limited as merely procedural in nature.  This Court will abide by the terms of this contract and not allow form to undermine the contract's function and plain text meaning.  As such, this Court finds that a plain interpretation of the Petronius contract, without the use of the "former over the latter" rule, supports Summary Judgment in favor of AmClyde.

### ***CONCLUSION***

For these reasons Defendant's Motion for Summary Judgment is **GRANTED.**

New Orleans, Louisiana, this 19th day of March, 2008.

IVAN L. R. LEMELLE
UNITED STATES DISTRICT COURT